UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ATLAS NOBLE, LLC, | ) | CASE NO. 5:13CV1505 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| KRIZMAN ENTERPRISES, et al., | ) | **AND ORDER** |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is plaintiff's motion for judgment on the pleadings (Doc. No. 15) in its favor on all counts of defendants' counterclaim.[1] Defendants have filed a brief in opposition (Doc. No. 20), and plaintiff has filed a reply (Doc. No. 24). Defendants have also filed a motion for leave to amend their counterclaim (Doc. No. 21), which plaintiff has not opposed.

For the reasons set forth herein, plaintiff's motion for judgment on the pleadings is **DENIED** and defendants' motion for leave to amend their counterclaim is **GRANTED**.

### I. BACKGROUND

On July 11, 2013, plaintiff Atlas Noble, LLC ("Atlas") filed its one-count complaint for breach of contract against defendants Krizman Enterprises ("Krizman"), Wayne Hammond Enterprises ("WHE"), and MKE Producing, Inc. ("MKE") (collectively, defendants")

---

[1] Doc. No. 8.

for their alleged failure to authorize release to Atlas of a certain escrow account. The genesis of this claim lies in the following facts.[2]

Plaintiff and defendants are parties to a Purchase and Sale Agreement (the "Agreement") originally executed on or about September 11, 2012. Defendants (the "Seller" under the Agreement) owned certain oil and gas leasehold interests in Tuscarawas County, Ohio, set forth in Exhibit A to the Agreement (the "Conveyed Interests"),[3] that plaintiff (the "Buyer" under the Agreement) wished to purchase, subject to the Seller's reservation of a 20% royalty interest. As one of several of "Buyer's Conditions to Closing," the Agreement required that "Seller shall be in a position to deliver to Buyer a minimum of eighty percent (80%) of the cumulative acreage totals set forth on Exhibit A." (Agreement § 6.2(iv).) This amount of acreage was subsequently reduced to 76.85%, by way of an amendment to the Agreement. (Second Amendment ¶ C.)[4]

The "Closing Date" was originally designated in the Agreement as "not later than December 15, 2012 or such other date as Buyer and the Seller may mutually agree in writing . . . ." (Agreement § 1.1.) The Closing Date was extended twice, first to February 15, 2013 (by the First Amendment), and then to April 3, 2013. The relevant section of the Second Amendment provides: "Section 1.1 of the Agreement shall be amended such that the 'Closing Date' shall be changed from February 15, 2013 to April 3, 2013, or such other time as the Parties may mutually agree." (Second Amendment ¶ A.)

---

[2] The Court does not intend this factual recitation to be construed as any kind of "fact-finding." The facts are set forth merely as context for this opinion. If and when this case proceeds to dispositive motions and/or trial, all facts not jointly stipulated to must be proven according to the usual standards and burdens of proof.

[3] A copy of the Agreement, together with its exhibits, is attached to the counterclaim. (Doc. No. 8-1.)

[4] The Agreement was amended twice. Copies of these amendments are attached to the counterclaim as Exhibits 2 and 3. (Doc. Nos. 8-2 and 8-3.)

Upon execution of the Agreement, Section 1.2 of the Agreement required Buyer to deposit into an escrow account with Wells Fargo Bank the sum of $2,411,290.00 (the "Escrow Amount"). The Agreement further provided:

> . . . If the transaction contemplated by this Agreement closes, then the Escrow Amount shall be forwarded by the Bank to Seller and the Escrow Amount shall reduce the Base Purchase Price as described in Section 1.3 below. If the transaction contemplated by this Agreement does not close because of Seller's failure to satisfy one of Buyer's Conditions to Closing as set forth in Section 6.2 hereof, then Bank shall return the Escrow Amount to Buyer. If the transaction contemplated by this Agreement does not close for any reason other than as set forth in Section 6.2, then Bank shall pay the Escrow Amount to Seller. . . .

(Agreement § 1.2.)

The parties agree that "the entire responsibility for ensuring that . . . [S]eller[] had good title to the oil and gas interests and assets they were selling rested with Atlas." (Compl. ¶ 19; Answer ¶ 19.) Section 4.1 of the Agreement provided:

> Between the execution of this Agreement and 5:01 p.m. Eastern Standard Time on [April 3, 2013] (the "Review Period"), Seller shall make available for review by Buyer and its representatives, during normal business hours, excluding weekends and holidays, all records relating to title (including contracts, correspondence, files and prior title opinions) in its possession pertaining to the Leases for purposes of permitting Buyer to review Seller's title to the Leases. Seller shall also make available to Buyer and Buyer's representatives, upon reasonable notice during normal business hours, Seller's personnel knowledgeable with respect to the title condition of the Assets in order that Buyer may make such title diligence investigation as Buyer considers necessary or appropriate. Buyer acknowledges that, except as set forth in Section 4.2 hereof, Seller has made no warranty or representations concerning title to the Leases and that Buyer is not relying upon any such representation of Seller or any Seller representative in making its determination whether or not to purchase the Assets. Buyer shall be deemed to have accepted such title as Seller may be able to convey, provided the transaction contemplated herein closes.

In Section 4.2 of the Agreement, the Seller made the following general disclaimer:

> . . . Seller makes no warranty or representation, express, implied, statutory or otherwise, with respect to Seller's title to any of the Conveyed Interests, and Buyer hereby acknowledges and agrees that Buyer's sole remedy for any defect of title, with respect to any of the Conveyed Interests shall be a reduction in the Purchase Price pursuant to the methodology described in Section 4.3.

On April 2, 2013, Atlas provided defendants with a chart showing the current status of its title work with respect to the acreage being conveyed to Atlas. (Countercl. ¶ 11 and Ex. 4.) As of that date, defendants had title to 69.878% of the cumulative acreage total. (*Id*., ¶ 14.)

At an unspecified time on April 3, 2013, "VIA TELECOPY, EMAIL AND NEXT DAY DELIVERY (Friday)," Atlas provided a written communication to defendants purporting to terminate the Agreement due to Seller's "fail[ure] to satisfy Section 6.3 of the Agreement, as amended, by close of business on April 3, 2013, as it has not cleared title to more than 76.85% of the cumulative acreage totals set forth on Exhibit A to the Agreement." (Countercl. ¶ 18 and Ex. 5 (capitalization in original).)[5]

Atlas has demanded that defendants release the Escrow Amount to Atlas, pursuant to Section 1.3 of the Agreement, but defendants have refused. (Compl. ¶¶ 28-31.) Therefore, Atlas filed its complaint for breach of contract.

Defendants, in response, filed their answer and a counterclaim asserting that Atlas unilaterally terminated the Agreement, and refused to close the transaction, prior to expiration of the closing date, April 3, 2013. They assert that the Escrow Amount should be released to them under the terms of the Agreement and that they should be awarded damages for Atlas's breach of contract.

---

[5] As properly pointed out by defendants, the Agreement contains no Section 6.3. (Countercl. ¶ 20.)

## II. DISCUSSION

### A. Motion for Judgment on the Pleadings (Doc. No. 15)

#### 1. Standard of Review

Motions for judgment on the pleadings under Fed. R. Civ. P. 12(c) are generally analyzed under the same standard as motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *Mellentine v. Ameriquest Mortg. Co.*, 515 F. App'x 419, 423 (6th Cir. 2013) (citing *EEOC v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001)). The Court must "construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief." *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998) (citing *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 475 (6th Cir. 1990)). In this case, the "complaint" whose allegations must be accepted as true is the counterclaim.

#### 2. Analysis

The primary argument made by Atlas in support of its request for judgment on the pleadings in its favor on defendants' counterclaim is that defendants "fail to allege that, before the expiration of the Review Period, they [defendants] had defensible title to the necessary 76.85% of the cumulative acreage total." (Motion at 203.) Therefore, in Atlas's view, the transaction contemplated by the Agreement did not close because of a failure by defendants to meet one of the "Buyer's Conditions to Closing." Atlas asserts that this entitles it to the funds in the escrow account. In opposition, defendants argue that, had they been given the full day on April 3, 2013, not just until 5:01 p.m. EST, the end of the Review Period, they would have been able to supply more than the required acreage. They assert that plaintiff anticipatorily repudiated (i.e., breached) the Agreement by unilaterally terminating it prior to the end of April 3, 2013.

To determine whether Atlas is entitled to judgment on the pleadings, the Court would first need to resolve on the merits a fair number of disputes between the parties over construction of the Agreement.[6]

Of particular consequence among those disputes is the meaning of "Closing Date" in the Agreement and, more specifically, whether the Closing Date had an associated *closing time*. If it had a closing time, was it 5:01 p.m. EST (the time when the Review Period ended) or the close of day on April 3, 2013? And, since the Buyer was assuming virtually all the risk with respect to title, should the provision for a Review Period be construed as proof of a requirement that defendants had to be "in a position to deliver to Buyer a minimum of [76.85%] of the cumulative acreage totals" before the end of the Review Period? Further, even if that were true, would that mean that 5:01 p.m. was the closing time, or would the parties still have had until the close of day on April 3, 2013 to actually close the transaction?

The Court would also need to decide whether, under the terms of the Agreement, defendants were required to convey clear title (which is plaintiff's position) or simply sufficient acreage (which is defendants' position).

Next, assuming for the sake of argument that the closing time was the close of day on April 3, 2013, the Court might also need to determine whether defendants would have been "in a position to deliver" the requisite acreage by the time of closing, as required by § 6.2 of the Agreement. Defendants allege in their counterclaim (and proposed amended counterclaim)[7] that

---

[6] The motion need not be converted to one for summary judgment under Fed. R. Civ. P. 12(d) because the Court has not considered any matters outside the pleadings, since the Agreement is attached to both the complaint and the answer/counterclaim.

[7] The relevant paragraphs of the counterclaim are set forth below (absent some original bolding, so as not to be confusing), with the proposed changes reflected by stricken text and underlined additions:

    14.    As set forth in the Exhibit 4 chart, on April 2, 2013, Defendants were prepared, ~~and~~ ready, willing, and able to deliver 1,686.9947 of the 2,414.21 net acres called for by

they were in a position to deliver more than the required acreage prior to the expiration of April 3, 2013. But, if that were not true, what would it matter that plaintiff terminated the contract before the close of day? Defendants argue that plaintiff committed an anticipatory repudiation of the Agreement, which, under Ohio law, immediately gives rise to a claim for total breach of contract and excuses performance by the injured party. *Daniel E. Terreri & Sons, Inc. v. Mahoning Cnty. Bd. of Comm'rs*, 152 Ohio App. 3d 95, 105, 786 N.E.2d 921 (Ohio Ct. App. 2003) (the non-breaching party has an immediate action for damages and total breach, and may rely on repudiation as a defense against a subsequent breach of contract action).

The Court concludes that there are simply too many unanswered questions and that judgment on the pleadings is, therefore, not only ill-advised at this early stage, but also precluded.

B.  **Motion for Leave to Amend Counterclaim and Answer (Doc. No. 21)**

Defendants seek leave to amend "to make . . . small changes, which primarily further confirm and clarify that the actions already pled constitute an anticipatory repudiation and breach by Plaintiff Atlas Noble, LLC." (Motion at 256.)

---

<div style="padding-left:2em">

Purchase Agreement Exhibit A. This, according to the Plaintiff's chart, represented 69.878% of the cumulative acreage total.

15. In addition, by April 3, 2013, Defendants finalized arrangements with the Muskingum Watershed Conservancy District ("MWCD") <u>and were prepared, ready, willing, and able to deliver</u> <s>for the delivery of</s> another 51.005 acres.

16. Finally, <u>on April 3, 2013,</u> the Defendants were finalizing arrangements with Beau Croxton ("Croxton") and Caldwell to complete the preparation for delivery to Plaintiff Atlas of an additional 118.9392 acres.

17. This brought the cumulative total net acres that would be ready for delivery at closing, before the expiration of <u>the Closing Date of</u> April 3, 2013, to 1,856.9389 acres, or 76.917% of the cumulative acreage total. This exceeded the 76.85% minimum required for closing in accordance with the Second Amendment.

</div>

These are not the only paragraphs where defendants have proposed changes to the counterclaim; however, these are the paragraphs most relevant to the instant discussion.

Fed. R. Civ. P. 15(a) requires that leave to amend a pleading be freely given "when justice so requires." The Sixth Circuit requires consideration of several factors:

> Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision. Delay by itself is not sufficient reason to deny a motion to amend. Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted.

*Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458-59 (6th Cir. 2001) (quoting *Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989)).

The Court concludes that none of these factors apply herein, and plaintiff has presented no argument to the contrary. Defendants will be permitted to amend.

### III. CONCLUSION

Finding too many questions on the merits that preclude judgment on the pleadings at this early stage, plaintiff's motion (Doc. No. 15) is **DENIED**. Defendants' motion for leave to amend the counterclaim (Doc. No. 21) is **GRANTED** and defendants shall forthwith file the pleading that was attached to the motion.

The case shall now proceed according to the Case Management Plan and Trial Order. (Doc. No. 18.)

**IT IS SO ORDERED**.

Dated: March 20, 2014

                                                **HONORABLE SARA LIOI**
                                                **UNITED STATES DISTRICT JUDGE**