UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ATLAS NOBLE, LLC, | ) | CASE NO. 5:13CV1505 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| KRIZMAN ENTERPRISES, et al., | ) | **AND ORDER** |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are fully briefed cross-motions for summary judgment. (Defendants' Motion, Doc. No. 58 ["DMSJ"]; Plaintiff's Motion, Doc. No. 59 ["PMSJ"].) Each motion has been opposed. (Plaintiff's Opposition, Doc. No. 63 ["POpp."]; Defendants' Opposition, Doc. No. 62 ["DOpp."].) Reply briefs have also been filed. (Defendants' Reply, Doc. No. 64 ["DReply"]; Plaintiff's Reply, Doc. No. 65 ["PReply"].)[1] For the reasons set forth herein, plaintiff's motion for summary judgment is denied, and defendants' motion for summary judgment is granted.

## I. PROCEDURAL BACKGROUND

In a one-count complaint filed on July 11, 2013, plaintiff Atlas Noble, LLC ("Atlas" or "plaintiff") asserted a breach of contract claim against defendants Krizman Enterprises ("Krizman"), Wayne Hammond Enterprises, Inc. ("WHE"), and MKE Producing, Inc. ("MKE") (collectively, "defendants") for their alleged failure to authorize release to Atlas of a certain escrow account.

---

[1] Herein, any page number references to documents in the record are to the page identification number generated by the Court's electronic docketing system.

Defendants filed a three-count counterclaim, seeking a declaratory judgment that they are entitled to the escrow monies, and setting forth two breach of contract claims: one relating to the escrow account and one relating to the underlying agreement between the parties, which defendants claim plaintiff repudiated.

Plaintiff's motion seeks judgment in its favor on the single count in the complaint and on all three counterclaims. Defendants' motion seeks judgment in their favor on plaintiff's complaint and on their first and second counterclaim.

## II. UNDISPUTED FACTS

Plaintiff and defendants are parties to a Purchase and Sale Agreement (Doc. No. 1-2 [the "PSA"]), originally executed on September 11, 2012 and subsequently amended in November 2012 and February 2013. (Doc. No. 1-3 [the "First Amendment"] & Doc. No. 1-4 [the "Second Amendment"].) Under the PSA, plaintiff agreed to purchase from defendants oil and gas leases covering 2,414.21 acres in Tuscarawas County, Ohio, set forth in Exhibit A to the PSA, at a Base Purchase Price of $5,000/acre. As one of several of "Buyer's Conditions to Closing," the PSA, as amended, required that, on or prior to closing, "Seller shall be in a position to deliver to Buyer a minimum of [76.85%] of the cumulative acreage totals set forth on Exhibit A." (PSA § 6.2(iv); Second Amendment ¶ C.) Therefore, under these terms, defendants needed to be in a position at closing to deliver at least 1,855.32 acres.

The parties agree that "the entire responsibility for ensuring that . . . [S]eller[] had good title to the oil and gas interests and assets they were selling rested with Atlas [the Buyer]." (Compl. ¶ 19; Answer ¶ 19.) To facilitate that process, PSA § 4.1, as amended, provided:

> Between the execution of this Agreement and 5:01 p.m. Eastern Standard Time on [April 3, 2013] (the "Review Period"), Seller shall make available for review by Buyer and its representatives, during normal business hours, excluding weekends

and holidays, all records relating to title (including contracts, correspondence, files and prior title opinions) in its possession pertaining to the Leases for purposes of permitting Buyer to review Seller's title to the Leases. Seller shall also make available to Buyer and Buyer's representatives, upon reasonable notice during normal business hours, Seller's personnel knowledgeable with respect to the title condition of the Assets in order that Buyer may make such title diligence investigation as Buyer considers necessary or appropriate. Buyer acknowledges that, except as set forth in Section 4.2 hereof, Seller has made no warranty or representations concerning title to the Leases and that Buyer is not relying upon any such representation of Seller or any Seller representative in making its determination whether or not to purchase the Assets. Buyer shall be deemed to have accepted such title as Seller may be able to convey, provided the transaction contemplated herein closes.

(PSA § 4.1; Second Amendment ¶ B.)[2] The principals of all three defendants agree that the purpose of the Review Period was to give Atlas time to determine whether defendants had defensible title to the necessary acreage. (WHE Dep. [Doc. No. 56][3] at 2023; Krizman Dep. [Doc. No. 55] at 1718; MKE Dep. [Doc. No. 54][4] at 1597.)

The "Closing Date" (originally December 15, 2012) was extended by the Second Amendment, which provided: "Section 1.1 of the [PSA] shall be amended such that the 'Closing Date' shall be changed . . . to April 3, 2013, or such other time as the Parties may mutually agree." (Second Amendment ¶ A.) Unlike the "Review Period" that ended at a specific time (5:01 p.m. Eastern Standard Time), the PSA contained no specific cutoff time for the "Closing Date."

---

[2] In Section 4.2, referenced in Section 4.1, the Seller made the following general disclaimer:

> . . . Seller makes no warranty or representation, express, implied, statutory or otherwise, with respect to Seller's title to any of the Conveyed Interests, and Buyer hereby acknowledges and agrees that Buyer's sole remedy for any defect of title, with respect to any of the Conveyed Interests shall be a reduction in the Purchase Price pursuant to the methodology described in Section 4.3.

[3] Raymond Pander, as president of defendant Wayne Hammond Enterprises, Inc., testified in a Rule 30(b)(6) deposition.

[4] Michael Sherman, the sole owner of defendant MKE Producing, Inc., testified in a Rule 30(b)(6) deposition.

Section 1.2 of the PSA required Atlas to deposit $2,411,290.00 into an escrow account with Wells Fargo Bank (the "Escrow Amount"), and further provided:

> . . . If the transaction contemplated by this Agreement closes, then the Escrow Amount shall be forwarded by the Bank to Seller and the Escrow Amount shall reduce the Base Purchase Price as described in Section 1.3 below. If the transaction contemplated by this Agreement does not close because of Seller's failure to satisfy one of Buyer's Conditions to Closing as set forth in Section 6.2 hereof, then Bank shall return the Escrow Amount to Buyer. If the transaction contemplated by this Agreement does not close for any reason other than as set forth in Section 6.2, then Bank shall pay the Escrow Amount to Seller. . . .

(PSA § 1.2.) Similarly, § 1.3 provided, in relevant part:

> . . . If Buyer fails to close the transaction contemplated by the Agreement, for one of the following reasons: that (a) Seller does not have defensible title to . . . equal to at least [76.85%] of Seller's cumulative acreage totals, . . . then Buyer and Seller will authorize the release of the Escrow Amount in the Deposit Account to Buyer. The foregoing exceptions shall be determined by Buyer in its reasonable discretion and upon such determination by Buyer, Buyer and Seller will authorize, in writing, the release of the Escrow Amount in the Deposit Account to Buyer. In all other events, the Escrow Amount will be paid and released to Seller as part of the purchase price paid at Closing and Buyer and Seller will authorize, in writing, the release of the Escrow Amount in the Deposit Account to Seller.

(PSA § 1.3; Second Amendment ¶ C.[5])

Under PSA § 4.3(a), on or before the end of the Review Period, Atlas "at its sole and absolute discretion," was permitted "to exclude all or any portion of a Lease for title related matters" and, if Atlas took such action, there would be "a corresponding impact on the Purchase Price" calculated according to a methodology detailed in § 4.3(a)(i)-(iv). Pursuant to this section, on January 28, 2013,[6] Brad Piroli[7] sent a letter to defendants stating that Atlas had "completed its

---

[5] Strictly speaking, the Second Amendment ¶ C does not expressly amend the percentage in PSA § 1.3, since it only mentions §§ 6.1(iv) and 6.2(iv) and the PSA's second recital. However, the Court presumes this was an oversight, since failure to similarly adjust PSA § 1.3 would result in an inconsistency. No party makes a contrary argument.

[6] All parties agree that this letter is misdated as "2012."

[7] Piroli is employed by Atlas as its Ohio Land Manager, which he testified "generally consists of generating new prospects for development, leasing or acquiring the rights to drill underneath the property for horizontal or conventional oil and gas development, reviewing title associated with those leaseholds or those assets, procuring

title review and has adjusted the net acres for each subject lease accordingly." (DMSJ, Ex. D [Doc. No. 58-6] at 2480.) The letter included a chart wherein "title defects for each of the subject leases [were] also noted[.]" (*Id*.) Finally, the letter stated:

> Atlas intends to purchase approximately **1,861.3361** acres or 76.85% of the net acres stated in the Purchase and Sale Agreement on or before the new closing date which is proposed to be April 3, 2013, **SUBJECT TO THE FOLLOWING:**
>
> - All other conditions to closing are met under Article 6.1 of Purchase and Sale Agreement
> - All of the said curative items are corrected prior to said date

(*Id.* at 2481, emphases in original.)

On April 2, 2013, at 2:19 p.m., Piroli emailed defendants a spreadsheet showing a few remaining title conditions with respect to the acreage being conveyed to Atlas. (DMSJ, Ex. E [Doc. No. 58-7].) The spreadsheet showed that, although as of that date defendants had title to only 69.878% of the cumulative acreage total, they could reach the required percentage (76.85%) by completing the following:

> MWCD [Muskingum Water Conservancy District]: executed modification, letter agreement regarding severance tax
>
> LOI #8: Ralph Ervin: quit claim deed from Huntington National Bank for Croxton and Caldwell parcels totaling 118.9392 acres, release of Ervin lease, executed leases from Croxton and Caldwell totaling 118.9392 acres, confirmation of payment of both leases."

(*Id.* at 2503.)

There is no dispute that the requirements for the MWCD acreage were timely satisfied. As to the Ervin Lease, Huntington National Bank did execute the quit claim deeds

---

title, obtaining surface owner consents to allow us to have the rights to the surface and any other miscellaneous requests by the other departments at Atlas, which would also include review of division orders, making sure land owners get paid on time." (Piroli Dep. [Doc. No. 48] at 559.)

(Piroli Dep. [Doc. No. 48] at 599, 627), and defendants argue (as discussed in more detail below) that, as of "late in the day" on April 3, 2013, there was an "agreement in principal [sic]" with respect to the Croxton and Caldwell leases. (DMSJ at 2405.)

At 5:52 p.m. on April 3, 2013, Joel Heiser, General Counsel for Atlas, emailed a letter to defendants informing them that Atlas was terminating the PSA due to defendants' "fail[ure] to satisfy Section 6.3 of the [PSA], as amended, by close of business on April 3, 2013, as it has not cleared title to more than 76.85% of the cumulative acreage totals set forth on Exhibit A to the [PSA]." (DMSJ, Ex. I [Doc. No. 58-11].) As properly pointed out by defendants, the PSA contains no § 6.3; however, the Court presumes this is a non-material typographical error, since all parties agree that the acreage requirement was set forth in § 6.2.

There is no dispute that, after receipt of this letter, defendants took no further action to deliver defensible title to the Ervin Lease. Defendants assert, as discussed in greater detail below, that there was no need to do so because Atlas's letter constituted a repudiation of the PSA.

### III. DISCUSSION

**A.  Standard of Review**

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be

made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina College v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-

moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

**B.     Analysis**

Atlas has demanded that defendants release the Escrow Amount to Atlas, pursuant to PSA § 1.3, which provides that, should the transaction not close due to defendants' inability to deliver sufficient defensible title, the Escrow Amount should be returned to Atlas. Atlas takes the position that, at no time on April 3, 2013 were defendants in a position to deliver defensible title to 75.86% of the total acreage.

Defendants, for their part, claim that they are entitled to the Escrow Amount pursuant to PSA § 1.2, which provides that, should the transaction not close for any reason other than those set forth in § 6.2 (particularly, a reason other than defendants' inability to deliver defensible title), the Bank should pay the Escrow Amount to defendants. Defendants take the position that Atlas repudiated the PSA prior to closing and, therefore, relieved them of any duty to deliver defensible title to the required amount of acreage.

Section 7.4(a) of the PSA provides that Ohio law governs. Under Ohio law, "[a]n anticipatory breach of contract by a promisor is a repudiation of the promisor's contractual duty before the time fixed for performance has arrived." *McDonald v. Bedford Datsun*, 570 N.E.2d 299, 301 (Ohio Ct. App. 1989) (citation omitted). "To prevail on a claim of anticipatory breach of contract, a plaintiff must establish that there was a contract containing some duty of performance not yet due and, by word or deed, the defendant refused future performance,

8

causing damage to the plaintiff." *Metz v. Am. Elec. Power Co., Inc.*, 877 N.E.2d 316, 323 (Ohio Ct. App. 2007) (citation omitted). Any refusal to perform "must be expressed in clear and unequivocal terms[.]" *McDonald*, 570 N.E.2d at 301.

Since anticipatory breach is a counterclaim, defendants bear the burden of establishing the elements of the claim. The PSA contained several duties, but, primarily, defendants had a duty to deliver defensible title to their oil and gas interests in 76.85% of the acreage listed in PSA Ex. A, and Atlas had a duty to buy those interests. The question here is when those duties were to be performed. Defendants argue that the deadline was 11:59 p.m. on April 3, 2013. They claim that Atlas cut off defendants' duty to perform (*i.e.*, to deliver the requisite percentage of defensible title) by repudiating the PSA six hours before midnight.

Plaintiff argues, in opposition and in its own motion, that, at 5:52 p.m. on April 3, 2013, when it issued notice that it was terminating the PSA, defendants were clearly unable to deliver the requisite percentage of defensible title. Plaintiff makes this argument based solely on its assertion that, to deliver such title, defendants were required to record the leases and, by 5:52 p.m., the county recorder's office was indisputably already closed. Therefore, in plaintiff's view, it did not anticipatorily breach or repudiate the PSA by terminating it at 5:52 p.m. rather than at 11:59 p.m. on April 3, 2013.

"The role of courts in examining contracts is to ascertain the intent of the parties. Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *St. Marys v. Auglaize Cnty. Bd. of Comm'rs*, 875 N.E.2d 561, 566 (Ohio 2007) (internal citations omitted).

Here, § 6.2 states that, "on or prior to the Closing[,]" defendants had to be "in a position to deliver" the requisite percentage of the total acreage. It does not say that recordation

9

of all the paperwork was required to show defensible title. (In fact, the *only* mention of recording in the PSA is at § 7.2, which contemplates plaintiff's duty to record promptly after Closing.) Under Ohio law, "a deed does not have to be recorded to pass title." *Wayne Bldg. & Loan Co. of Wooster v. Yarborough*, 228 N.E.2d 841, 853 (Ohio 1967). Rather, "[w]hether or not recorded, a deed in Ohio passes title upon its proper execution and delivery, so far as the grantor is able to convey it." *Id.* (citing *Baldwin v. President, etc., Bank of Massilon*, 1 Ohio St. 141, 148 (1853)). "It is fundamental under Ohio law that recording is not necessary to give validity to instruments of conveyance . . . , and the failure to record [an] instrument [has] no effect on its validity." *In re Estate of Ault*, 609 N.E.2d 568, 570 (Ohio Ct. App. 1992). Furthermore, neither plaintiff's January 28, 2013 letter nor its April 2, 2013 email (both regarding the remaining title defects that required curing) indicated that recording would be required prior to Closing.[8]

Plaintiff's attempt to argue that it is entitled to summary judgment because defendants did not have the necessary acreage at the end of the *Review Period* is to no avail. As noted by plaintiff itself, the purpose of the Review Period was to allow Atlas time to determine whether defendants had title to sufficient acreage. But Atlas had that opportunity, and reported to defendants on January 28, 2013 that it had completed its title review, advising defendants regarding its adjustment of net acres and certain "curative items" that would be required for closing. Then, on April 2, 2013, Atlas again advised defendants as to the final few remaining requirements by which defendants could satisfy Atlas that it had defensible title.

"'[A] contract which, by its terms, expires on a certain day, remains in force for the whole of that day unless by its express wording it is limited to a certain time of day upon

---

[8] Plaintiff tries to bootstrap a recording requirement into the contract by pointing to deposition testimony of Piroli to the effect that "those leases should be of record and recorded so that they could be conveyed to Atlas." (Piroli Dep. [Doc. No. 48] at 599.) However, Piroli's testimony cannot alter the language of the PSA, where there is no requirement of recording, especially in light of the fact that Ohio law also has no such requirement.

which it expires.'" *Greulich v. Monnin*, 50 N.E.2d 310, 312 (Ohio 1943) (quoting *Garelick v. Rosen*, 8 N.E.2d 279, 280 (N.Y. 1937)). The fact that plaintiff may have completed its title review *prior to* 5:01 on April 3, 2013, is no reason to accelerate the deadline for Closing.

In summary, to deliver defensible title to Atlas, defendants were only required, under Ohio law, to have the necessary executed instruments, without any requirement that they record those instruments. Therefore, there was no way of knowing until 11:59 p.m. on April 3, 2013 whether defendants could deliver defensible title. They claim that they were in a position to do so because they had made arrangements (extensively set forth in their motion) for all the principals and their lawyers to meet to review and sign all the documents for delivery to Atlas prior to Closing.

The Court actually need not determine whether defendants' assertion is true for the simple reason that, at 5:52 p.m. on April 3, 2013 (*i.e.*, six hours too soon), Atlas unilaterally gave notice, in clear and unequivocal terms, that it was "terminat[ing] the [PSA] pursuant to Section 8.1." (DMSJ, Ex. I [Doc. No. 58-11] at 2544.)[9] Under Ohio law, this was an anticipatory repudiation (*i.e.*, a breach) of the PSA, giving defendants the option to stop their performance and the right to sue for damages. *See Sunesis Trucking Co., Inc. v. Thistledown Racetrack, L.L.C.*, No. 100908, 2014 WL 4067682, at *6 (Ohio Ct. App. July 31, 2014); *see also Se. Land Dev., Ltd. v. Primrose Mgmt., L.L.C.*, 952 N.E.2d 563, 571 (Ohio Ct. App. 2011) ("the injured party can either terminate the entire contract, which extinguishes its duties, or it can continue with the contract, which requires that it fulfill its obligations under the contract as well. To allow

---

[9] Section 8.1 of the PSA actually required that any termination must be "by mutual written agreement of the parties[.]" Either Buyer or Seller could terminate it on their own "if the Closing shall not have occurred on or before [April 3, 2013.]" (PSA § 8.1; Second Amendment ¶ A.) But this begs the question: *when* is the deadline for Closing -- 5:01 p.m. or 11:59 p.m.?

11

a party to use the prior breach of the other party as a reason not to perform any of its duties while continuing the contract would lead to very inequitable results").

Further, under PSA § 1.2, because the deal failed to close for a reason other than that expressed in PSA § 6.2, the Escrow Amount is to be paid to defendants. This deal failed to close because of Atlas's anticipatory repudiation, not because of any failure on defendants' part to deliver sufficient defensible title.

Plaintiff argues that defendants' anticipatory repudiation claim must fail as a matter of law. Plaintiff points to *Bagnoli v. Cleveland Trust Co.*, 79 N.E.2d 557 (Ohio 1948) for the proposition that defendants have to prove that they satisfied all of their respective obligations under the PSA aside from formal tender. (PMSJ at 2669.) In *Bagnoli*, the Ohio Supreme Court held that "in an action for damages for breach of contract [based on defendant's renunciation of the contract] the plaintiff although relieved of the necessity of formal tender, has the burden of showing not only willingness and readiness but also ability to perform the covenants on his part to be performed including the ability to convey marketable title." *Id.* at 558 (footnote omitted).

*Bagnoli* is of no assistance where, as here, defendants still had six hours within which to perform their covenants, *i.e.*, to convey defensible title. *Bagnoli* would support plaintiff's position only if plaintiff had called off the deal at 11:59 p.m. on April 3, 2013. There is no claim by plaintiff that Croxton and/or Caldwell themselves did not have title to their respective acreage. As such, that title could have been transferred to Atlas had it only given defendants sufficient time. Due to Atlas's repudiation six hours before Closing, however, the Court need not speculate as to what, if anything, could have gone wrong during those six hours to prevent defendants from being "in a position to deliver" defensible title to the requisite

12

amount of acreage. Strictly speaking, no one will ever know whether defendants would have been in a position to fully perform.

That said, notwithstanding plaintiff's arguments to the contrary that there are questions of material fact for a jury, the undisputed facts in the record support defendants' assertion that they actually would have been "in a position" to deliver title to the Ervin Lease and, thereby, to deliver title to at least 75.86% of the cumulative acreage in question by the time of Closing (*i.e.*, by 11:59 p.m. on April 3, 2013) had Atlas not first terminated the PSA. On April 2, 2013, Atlas had advised that four conditions with respect to the Ervin Lease must be satisfied for Atlas to conclude that there was defensible title: (1) quit claim deeds from Huntington National Bank; (2) a release of the Ervin Lease by WHE; (3) new executed leases from Croxton and Caldwell; and (4) confirmation of payment of both leases.

As noted above, by Atlas's own admission, there is no dispute that Huntington issued the quit claim deeds, satisfying the first requirement. WHE was the owner of the Ervin Lease. Raymond Pander, President of WHE, attested that he was ready, and had the authority, to sign the release of the lease at closing, thus satisfying the second of Atlas's final requirements. (Pander Aff. [Doc. No. 58-9] at 2540.) Defendants outline in significant detail in their motion, which need not be set forth here, how Croxton and Caldwell and their lawyers were prepared to meet on the evening of April 3, 2013 to execute new leases to WHE on their respective acreages, to thus satisfy the third requirement. (*See* DMSJ at 2404-2408.) Finally, Croxton and Caldwell confirm Pander's deposition testimony that he was prepared to issue WHE company checks in payment of the leases, and they would accept those checks, thereby satisfying the fourth

requirement. (*See* Pander Dep. [Doc. No. 56] at 2084, 2103; Croxton Dep. [Doc. No. 50] at 986-87; Caldwell Dep. [Doc. No. 53] at 1518.)[10]

Although not necessary for the legal analysis leading to the conclusion that defendants are entitled to summary judgment, the Court notes that the record also reflects that, by March 2013, Atlas had lost interest in the acreage covered by the PSA and had begun strategizing how it could avoid closing. For instance, in an email dated March 20, 2013 from Piroli to Joel Heiser, Brad Eubanks, and Frank Rotunda,[11] with a subject line: "Krizman Exit Strategy," Piroli stated:

> Per our discussion at the March 6th ops meeting, we have stopped curative efforts related to the "Ervin" lease. Since this point in time, no additional efforts have been made; however, the attached documentation from the landowners' attorney shows that they continually try to cure this issue which pushes us closer to the conditions to close set forth in the PSA. This would normally be a good thing, but in light of our decision to walk away last week, it presents some challenges.
>
> In the event the event [sic] the Seller's [sic] satisfy Article 6.1(iv) we would either (a) close under the terms and conditions of the PSA or (b) chose [sic] to default and lose the deposit money. I believe we should discuss this possibility today and come up with a decisive plan of action.

---

[10] Two other brief arguments are raised by Atlas, which the Court rejects.

First, in both its opposition to defendants' MSJ and its reply in support of its own MSJ, Atlas makes a very brief argument that, the Ervin Lease transaction could not have been executed on time purportedly due to an alleged "due diligence" period related to some side deal between Caldwell and Croxton. From the record, it appears the claim is that Croxton was going to transfer to Caldwell title to about 45 of Croxton's acres, but that Caldwell would first require a several-hour due diligence period that would arguably not have ended prior to Closing under the PSA. (*See* POpp. [Doc. No. 63] at 2977-78; PReply [Doc. No. 65] at 3149.) The testimony from Croxton's deposition that plaintiff relies upon is not definitively supportive of the argument, especially when read in context with Caldwell's testimony about his understanding of the material terms of the deal. (*See* DReply [Doc. No. 64] at 3060.) When the testimony of the two is read in context, Croxton was simply speculating that Caldwell had in mind a due diligence period, but Caldwell himself made no mention of any such requirement. The Court concludes that this argument neither raises a material factual dispute precluding summary judgment, nor alters the Court's analysis.

Second, Atlas claims that defendants, *during a status conference* on June 13, 2014, raised an argument that Atlas had waived the requirement that the Ervin Lease be delivered by closing. (PMSJ [Doc. No. 59] at 2671-73.) Despite the fact that this claim has *never* been raised in the pleadings or, for that matter, in defendants' *own motion*, defendants nonetheless opposed the argument, asserting that there was a March 13, 2013 email that constitutes a waiver. (DOpp. [Doc. No. 62] at 2899-2903.) The Court sees no need to address this argument.

[11] Heiser is General Counsel for Atlas (Heiser Dep. [Doc. No. 47] at 443); Eubanks is Atlas's Vice President of Land (Eubanks Dep. [Doc. No. 49] at 753); Rotunda is Atlas's Eastern Region Land Director (DMSJ at 2410).

(DMSJ, Ex. K at 2548-49.) Atlas's eagerness to "walk away" may have caused it to jump the gun and prematurely terminate the PSA. Whatever the reason, the record is clear that plaintiff's actions amounted to an anticipatory breach of the contract.

## IV. CONCLUSION

For the reasons set forth herein, defendants are entitled to summary judgment with respect to Count I of the complaint and Counts I and II of their amended counterclaim. Specifically, defendants are entitled to have the Escrow Amount paid to them, plus any accrued interest, and to have judgment on these three claims entered in their favor against plaintiff.

## V. REMAINING COUNTERCLAIM FOR TRIAL

The ruling above does not resolve defendants' third counterclaim, which neither side's motion addresses. In that counterclaim, defendants seek an order that Atlas breached the PSA by terminating it before Closing, resulting in damages to defendants equal to the purchase price of $9,284,694.50, plus interest. In light of the Court's ruling and the remedies contained in § 1.2 of the PSA for a failure to close the transaction, the Court questions whether defendants are entitled to proceed on this claim.

**IT IS SO ORDERED**.

Dated: February 5, 2015

                                        **HONORABLE SARA LIOI**
                                        **UNITED STATES DISTRICT JUDGE**