**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ATLAS NOBLE, LLC, | ) | CASE NO. 5:13CV1505 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| KRIZMAN ENTERPRISES, et al., | ) | **AND ORDER** |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is plaintiff's motion to alter or amend the Court's Memorandum Opinion and Order dated February 5, 2015, and a brief in support. (Doc. No. 82 ["Motion"] and Doc. No. 83 ["Mot. Brief"].) Defendants filed a brief in opposition. (Doc. No. 84 ["Opp'n"].) For the reasons set forth herein, the motion is denied.

## I. BACKGROUND

On July 11, 2013, plaintiff Atlas Noble, LLC ("Atlas" or "plaintiff") filed a one-count complaint against defendants Krizman Enterprises ("Krizman"), Wayne Hammond Enterprises ("WHE"), and MKE Producing, Inc. ("MKE") (collectively, "defendants") seeking the release by defendants of a certain escrow account. Defendants counterclaimed, seeking a declaratory judgment that they are entitled to the escrow monies, and setting forth two breach of contract claims relating to the escrow account and the underlying agreement between the parties.

On February 5, 2015, the Court issued its Memorandum Opinion and Order on the parties' cross-motions for summary judgment (*See* Doc. No. 73 ["MOO"]), ruling that defendants were entitled to judgment in their favor on plaintiff's claim and on Counts I and II of their amended counterclaim, meaning that defendants were entitled to have the escrow monies

paid to them, plus any accrued interest, and to have judgment in their favor entered on these three claims. No final judgment has yet been entered, since defendants' third counterclaim was not resolved by the summary judgment ruling. The Court, however, doubts that defendants are entitled to proceed with that claim.

## II. DISCUSSION

### A.    Standard of Review

"District courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) (citation omitted). "This authority allows district courts to afford such relief from [interlocutory orders] as justice requires." *Id.* (alteration in original) (internal quotation marks and citation omitted). "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Id.* (citing *Reich v. Hall Holding Co.,* 990 F. Supp. 955, 965 (N.D. Ohio 1998)). "This standard obviously vests significant discretion in district courts." *Id.* at 959 n. 7. Case law is clear, however, that a movant "must show more than a disagreement with the Court's decision, and recapitulation of the cases and arguments considered by the Court before rendering its original decision fails to carry the moving party's burden." *Mott v. Lucas*, No. 1:10CV0164, 2011 WL 3705131, at *2 (N.D. Ohio Aug. 23, 2011) (internal quotation marks and citations omitted).

### B.    The Parties' Positions

Plaintiff argues that this Court erred in three ways: 1) by ignoring Ohio Rev. Code § 5301.09, which requires that oil and gas leases be recorded in order to be enforceable against

third parties; 2) by misapplying the undisputed facts when it concluded that defendants need not demonstrate that they had defensible title by the close of the Review Period and that Atlas had anticipatorily breached the PSA; 3) by interpreting the facts in a light most favorable to defendants, in particular, by failing to credit certain testimony of Beau Croxton, and by ignoring conflicting testimony regarding whether there was a "meeting of the minds" between Croxton/Caldwell and defendants with respect to the Ervin Lease transactions. (Mot. Brief at 3357.)[1] Plaintiff seeks to have this Court "correct its clear errors" and enter summary judgment in favor of plaintiff or, in the alternative, to permit the case to go to a jury.

Defendants oppose the motion, arguing that plaintiff is seeking reconsideration "based upon the same arguments it made during [s]ummary [j]udment briefing." (Opp'n at 3368.) They assert that "[m]otions for reconsideration are not substitutes for appeal nor are they vehicles whereby a party may present arguments inexplicably omitted in prior proceedings." *Id.* (quoting *Mott*, 2011 WL 3705131, at *3). Defendants also specifically refute each of plaintiff's three arguments.

## C.    Analysis

The Court is not inclined to reiterate its full reasoning herein, but will emphasize that there was a *contract* between these parties. They were free to agree to whatever terms were jointly satisfactory. This Court's role is to interpret the contract, not to overlay it with terms it did not include.

It is undisputed, and thoroughly explained in the Court's summary judgment ruling, that "on or prior to the Closing[,]" defendants needed to "be in a position to deliver" to

---

[1] All page number references are to the page identification number generated by the Court's electronic docketing system.

Atlas "defensible title … to at least [76.85%] of [defendants'] cumulative acreage totals[.]" (PSA §§ 1.3, 6.2; *see also* MOO at 3274-75.) It is also undisputed that, under the terms of the PSA, Atlas had until 5:01 p.m. EST on April 3, 2013 (the "Review Period") to determine whether defendants had defensible title to the necessary acreage. (PSA § 4.3.)

Atlas argues that, under Ohio Rev. Code § 5301.09, "no [oil and gas] lease or license is valid until it is filed for record, except as between the parties thereto, unless the person claiming thereunder is in actual and open possession." In Atlas's view, because it was not a party to the Croxton/Caldwell transactions with defendants, "the only way [d]efendants could deliver defensible title of these leases to Atlas was to record them first." (Motion at 3350.) Although Atlas argued generally on summary judgment that recording was required, this precise statutory argument was not raised until its reply brief and was, therefore, untimely. Atlas's own summary judgment argument was based primarily on the deposition testimony of Brad Piroli, its Ohio Land Manager (*see* Piroli Dep. [Doc. No. 48] at 599 ("those leases should be of record and recorded so that they could be conveyed to Atlas[]")), and on its interpretation of "defensible title" as the equivalent of "marketable title." While it is true that Atlas was not a party to any lease transaction between Croxton/Caldwell and defendants, it *was* a party to the PSA and, under the terms of that contract, Atlas cannot prevail.

The PSA does not require that any of the leases be *recorded* as a condition precedent to closing. The parties could have negotiated such a term, but they did not do so. In fact, under PSA § 4.1, Atlas expressly acknowledged that "Seller has made no warranty or representations concerning title to the Leases" and that Atlas "[was] not relying upon any such representation of Seller or any Seller representative in making its determination whether or not to purchase the Assets." If Atlas found any title defects, it could, before the end of the

4

contractually-defined Review Period and "at its sole and absolute discretion … determine to exclude all or any portion of a Lease for title related matters, which will then have a corresponding impact on the Purchase Price[.]" (PSA § 4.3(a).)

Pursuant to PSA § 4.3(a), Atlas "completed its title review" on January 28, 2013 and, by letter to defendants on that same date,[2] "adjusted the net acres for each subject lease" and provided a checklist of title defects for defendants to address. (*See* Doc. No. 58-6.) Atlas indicated its intent to purchase 76.85% of the listed acreage, which included the "Ralph K. Ervin" acreage held by Croxton and Caldwell. Atlas not only failed to exclude the acreage held by Croxton/Caldwell, but also made no mention that recorded leases would be required for closing.

After January 28, 2013, the parties continued to work toward closing by eliminating the checklist of title defects. By email dated April 2, 2013, Brad Piroli outlined the remaining "Conditions to Close." (Doc. No. 58-7.) With respect to the "Ralph K. Ervin" acreage, Piroli required the following: "quit claim deed from Huntington National Bank for Croxton and Caldwell parcels totaling 118.9392 acres, release of Ervin lease, *executed* leases from Croxton and Caldwell totaling 118.9392, confirmation of payment of both leases." (*Id.*, emphasis added.) Notably, the requirement was for only *executed* leases. Section 7.2 of the PSA further reinforced the fact that recording of the leases was not a contractual condition to close by explicitly making it Atlas's duty to record all the lease assignments "[p]romptly after Closing[.]"

The PSA does not define "defensible title," but construing the contract as a whole, the Court concluded that "to deliver defensible title to Atlas, defendants were only required, under Ohio [contract] law, to have the necessary *executed* instruments, without any [contractual]

---

[2] There is no dispute that the letter is mistakenly dated as 2012 rather than 2013.

5

requirement that they *record* those instruments." (MOO at 3276, alterations and italics added.)[3] Notwithstanding Atlas's repeated arguments to the contrary, the contract between the parties, which was freely negotiated, did not require defendants to deliver *recorded* oil and gas leases. As noted by the Court, "there was no way of knowing until 11:59 p.m. on April 3, 2013 whether defendants could deliver defensible title." (MOO at 3276.) Because "at 5:52 p.m. on April 3, 2013 (*i.e.*, six hours too soon), Atlas unilaterally gave notice, in clear and unequivocal terms, that it was 'terminat[ing] the [PSA] pursuant to Section 8.1[,]'" (*Id.*, quoting Doc. No. 58-11), Atlas committed "an anticipatory repudiation (*i.e.*, a breach) of the PSA, giving defendants the option to stop their performance and the right to sue for damages." (*Id.*) "Further, under PSA § 1.2, because the deal failed to close for a reason other than that expressed in PSA § 6.2, the Escrow Amount is to be paid to defendants." (*Id.* at 3277.)

### III. CONCLUSION

For the reasons set forth above, as well as those set forth in defendants' response in opposition (Doc. No. 84), the Court finds no reason to alter or amend its ruling on the cross-motions for summary judgment issued on February 5, 2015. Accordingly, plaintiff's motion to alter or amend (Doc. No. 82) is **DENIED**.

---

[3] This contractual interpretation is consistent not only with the language of the PSA as a whole, but also with the meaning of "defensible title" commonly accepted in the oil and gas industry, namely, "something less than marketable; it is imperfect on the record but is possible to defend." Thomas P. Schroedter, *Oil and Gas Title Examination and Title Curative: Marketable v. Defensible Title*, Comprehensive Land Practices, an AAPL Publication at III-48 (1st ed. 1984), n. 5. Therefore, "assuming a PSA only requires a defensible title, the title being provided by a seller does **not** have to be: 1. Perfect, without even minor defects; 2. Marketable; 3. Of record; 4. Free from the need to rely on parole evidence; 5. Free from the need to rely on affidavits; and 6. Free from the need for litigation to prove the title is valid." Kraettli Q. Epperson, *"Defensible Title" When Examining Oil and Gas Interests: An Overview of the Law in Oklahoma*, at p. 10 (November 4, 2009), http://eppersonlaw.com/?page_id=100 (last visited 6/30/15) (emphasis in original).

Further, absent a showing of good cause within ten (10) days from the date of this order, the Court intends to dismiss defendants' Counterclaim III[4] and enter final judgment consistent with the Court's Memorandum Opinion and Order filed on February 5, 2015 (Doc. No. 73).

**IT IS SO ORDERED**.

Dated: July 1, 2015

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[4] In the summary judgment ruling, the Court noted that counterclaim III "seeks an order that Atlas breached the PSA by terminating it before Closing, resulting in damages to defendants equal to the purchase price of $9,284,694.50, plus interest." (MOO at 3280.) But "[i]n light of … the remedies contained in § 1.2 of the PSA for a failure to close the transaction, the Court questions whether defendants are entitled to proceed on this claim." (*Id*.) The Court's view on this matter has not changed. Given that defendants will, upon entry of judgment, be entitled to the Escrow Account, that appears to be the sole contractual remedy for any breach by Atlas.